IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

APRIL ROFLOW o/b/o J.T.P.  PLAINTIFF

V.  NO. 15-5147

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security Administration  DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, April Roflow, brings this action pursuant to 42 U.S.C. §405(g), on behalf of her minor son, J.T.P., seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner), denying J.T.P.'s application for child's supplemental security income (SSI) benefits under Title XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. §405(g).

**I.  Procedural Background:**

Plaintiff protectively filed the application for SSI on J.T.P.'s behalf on April 13, 2012, alleging that J.T.P. was disabled beginning on May 25, 2011, due to a learning disability and Attention Deficit Hyperactivity Disorder (ADHD).[1] (Doc. 14, pp. 114-119, 143, 146). An administrative hearing was held on October 16, 2013, at which Plaintiff was represented by counsel, and she and J.T.P. testified. (Doc. 14, pp. 35-52).

In a written decision dated January 14, 2014, the ALJ found that J.T.P. was not disabled, as he did not have an impairment or combination of impairments that met or was functionally equal to a listed impairment. (Doc. 14, pp. 19-29).

---

[1] Plaintiff's attorney amended the onset date to April 13, 2012, at the hearing held before the ALJ. (Doc. 14, p. 39).

Plaintiff requested a review of the hearing decision by the Appeals Council, which denied that request on May 8, 2015. (Doc. 14, pp. 5-8). Subsequently, Plaintiff filed this action. (Doc. 1). The case is before the undersigned pursuant to the consent of the parties. (Doc. 7). Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 12, 13).

## II.     Applicable Law:

In this case, the ALJ employed a three-step sequential test to determine the validity of the alleged disability: 1) First, a determination of whether the child is engaged in substantial gainful activity; 2) Second, a determination of whether the child's impairments are "severe;" and 3) Third, whether the child's impairments are medically or functionally equal in severity to the listed impairments set forth in the Commissioner's disability regulations. (Doc. 14, p. 17).

With respect to the third step, "a child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment." Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 854 (8th Cir. 2003)(quoting 20 C.F.R. §416.926(a)). "A child's impairment is functionally equal to a listed impairment if there is an 'extreme' limitation in one of six specific functional domains, or a 'marked' limitation in at least two domains." Pepper, 342 F.3d at 854 (quoting 20 C.F.R. §416.926(a)).

"A marked limitation in a domain is a limitation that seriously interferes with a child's ability to 'independently initiate, sustain, or complete activities.'" England v. Astrue, 490 F.3d 1017, 1020 (8th Cir. 2007)(quoting 20 C.F.R. 416.926a(g)(2)(I ))). "A marked limitation is 'more than moderate' but 'less than extreme.'" Id. "An extreme limitation is one that 'interferes very seriously with [a child's] ability to independently initiate, sustain, or

2

complete activities.'" Scales v. Barnhart, 363 F.3d 699, 703-704 (8th Cir. 2004)(quoting 20 C.F.R. §416.926a(g)(3)(i)). "Domain analysis considers the child's age-appropriate functioning in relation to: acquiring and using information, attending and completing tasks, interacting and relating with others, moving around and manipulating objects, caring for oneself, and health and physical well being." Pepper, 342 F.3d at 854 (quoting 20 C.F.R. §416.926a(a)(1)(i)-(vi)). "The evaluation of age-appropriate functioning within each domain focuses on the child's abilities and limitations; where the child has difficulty; the quality of any limitations; and the kind, extent, and frequency of help that the child needs." Scott v. Astrue, No. 09-0196-CV-W-GAF-SSA, 2010 WL 750062 at *2 (W.D. Mo. Mar. 2, 2010).

**III.   Discussion:**

Plaintiff raises the following issues in this matter: 1) Whether the ALJ erred in finding J.T.P. only had marked, not extreme, limitations in acquiring and using information; 2) Whether the ALJ erred in finding J.T.P. had less than marked limitations in attending and completing tasks; and 3) Whether the ALJ erred in finding J.T.P.'s ADHD did not functionally or medically equal listing 112.11. (Doc. 12).

J.T.P. was born on January 28, 2004. (Doc. 14, p. 143). Plaintiff testified that J.T.P.'s problems started when he was 15 days old, and that one time he ended up with bronchitis to the point that he could not breathe, and had to be hospitalized. (Doc. 14, p. 42). The medical records reflect that in March of 2011, J.T.P. had a right inguinal hernia repair, performed by Dr. Guy Rosenschein. (Doc. 14, p. 480). A left inguinal hernia repair was performed on J.T.P. on July 27, 2012. (Doc. 14, p. 292).

On May 25, 2011, a Psychoeducation Evaluation Report was performed by Jennifer Shreve, M.S., a Certified School Psychology specialist, Licensed Psychological Examiner,

for Fayetteville Public Schools. (Doc. 14, p. 182). She reported that J.T.P.'s grade report from kindergarten the previous year indicated grades of mostly As and Bs, with one C in writing during the first semester. J.T.P.'s first grade teacher indicated that he had good social skills and loved outside activities, but was performing significantly below grade level in reading, spelling, writing, and math. (Doc. 14, p. 183). Ms. Shreve also reported that his teacher indicated J.T.P. tended to play, socialize and talk excessively instead of doing work in the classroom, and that this was despite modifications to the regular program, such as preferential seating, repeating/simplifying directions, one-on-one instruction and guidance, reduced assignments and conferencing with the parent. (Doc. 14, p. 183). Ms. Shreve reported that J.T.P. presented as an enthusiastic, active student with a good vocabulary, and that his attention and concentration were limited. (Doc. 14, p. 183). She also reported that J.T.P. had a full scale IQ of 89, and that test results indicated his significant strengths were in verbal reasoning ability and verbal comprehension, and his significant weaknesses were in nonverbal reasoning ability and visual-perceptual skills. (Doc. 14, p. 184). She found J.T.P.'s overall cognitive functioning to be at the high end of the low average range and his nonverbal reasoning ability to be at the high end of the borderline range. (Doc. 14, p. 188). She recommended placing J.T.P. in special education services in the areas of reading and math. (Doc. 14, p. 188).

On August 16, 2011, J.T.P. was seen by his treating physician, Dr. Ezinne C. Nwude, of UAMS Family Medical Center. (Doc. 14, p. 248). Dr. Nwude reported that J.T.P.'s teachers complained that he could not stay still in class, was always turning around in the classroom, doing what he wanted to do, and did not obey instructions. (Doc. 14, p. 248). Dr. Nwude assessed J.T.P. with attention or concentration deficit. (Doc. 14, p. 250).

On September 23, 2011, Dr. Nwude again saw J.T.P., and the previous assessment of attention or concentration deficit was unchanged. Dr. Nwude noted that J.T.P.'s mother's assessment of J.T.P. qualified for a diagnosis of ADHD Combined Inattention/Hyperactivity, but the teacher's assessment did not. (Doc. 14, pp. 246-247). Dr. Nwude encouraged J.T.P.'s mother to be more tolerant of his inattention at home and to help him with reading every night; to find out from the teacher if with the mother's help and other help, he was keeping up with his classmates in reading; and to hold off on medications and on giving him the diagnosis of ADHD considering his age, the seriousness of the diagnosis, and the side effects of the medications. (Doc. 14, p. 247).

On May 8, 2012, J.T.P. and his mother saw Dr. Nwude, who reported that J.P.T.'s mother and teachers showed that he was getting worse in all symptoms and performance. (Doc. 14, p. 234). Dr. Nwude therefore referred J.T.P. to Dr. Donna Van Kirk, Ed. D., Psychologist, for evaluation. (Doc. 14, p. 235). J.T.P. saw Dr. Van Kirk on May 9, 2012, upon Dr. Nwude's referral. (Doc. 14, p. 256). Dr. Van Kirk reported that J.T.P.'s two second grade teachers described him as constantly out of his seat, not concentrating, and very distractible. She also reported that J.T.P. would not work independently for more than five to ten minutes and only when he was rewarded with equal time to do an art activity. J.T.P. was reported as arguing excessively, especially with his father, Mr. Brandon Hicksom, was having temper tantrums several times daily when he was disciplined, and during outbursts, he was throwing objects, and had swung at his dad. (Doc. 14, p. 256). Dr. Van Kirk reported that J.T.P. made good eye contact, understood test demands, cooperated well, was physically active, was observed crossing and uncrossing his feet, swinging them around, and stretching his arms above his head. (Doc. 14, p. 256). He had difficulty with directionality, rate of speed

5

on paper-pencil tasks, and poor fine motor dexterity was observed. (Doc. 14, p. 256). Dr. Van Kirk concluded that J.T.P. was significantly more inattentive and distractible than same-age boys, and had more problems with learning, decision-making, judgment, and organization than his peers. (Doc. 14, p. 257). She diagnosed J.T.P. with ADHD, Combined type, recommended that he try medication, and recommended an occupational therapy evaluation. (Doc. 14, p. 485). She also recommended that J.T.P.'s parents present him with a united front regarding reasonable expectations and consequences. (Doc. 14, p. 485).

On June 26, 2012, Dr. Karen Schnute completed a Childhood Disability Evaluation Form. (Doc. 14, p. 263). She concluded that J.T.P.'s impairment or combination of impairments were severe, but did not meet, medically equal, or functionally equal the listings. (Doc. 14, p. 263). She found J.T.P. was less than marked in acquiring and using information; attending and completing tasks, and moving about and manipulating objects. (Doc. 14, p. 265). She further found that J.T.P. had no limitations in interacting and relating with others, caring for himself, or health and physical well-being. (Doc. 14, p. 265).

On July 16, 2012, J.T.P. saw Dr. Nwude, and based upon Dr. Van Kirk's recommendation, Dr. Nwude started J.T.P. on Focalin. (Doc. 14, pp. 273, 275). On July 30, 2012, J.T.P.'s mother reported to Dr. Nwude that he seemed to be doing better since the medication was started. (Doc. 14, p. 269). Dr. Nwude therefore diagnosed J.T.P.'s ADHD as "Improved." (Doc. 14, p. 271).

On October 12, 2012, after J.T.P. had his second inguinal hernia surgery, he saw Dr. Nwude, who noted that J.T.P.'s teachers reported that he was doing much better in school since starting his medication. (Doc. 14, p. 335). His mother reported that he still had episodes of temper tantrums and disobedience at home. Dr. Nwude's impression was "ADHD –

encouraged behavioral modification at home. Will consider parenting class or referral to OGC if behavior at home worsens." (Doc. 14, p. 337).

On November 7, 2012, a Teacher Questionnaire was completed by Melanie Kyle, a Special Education Instructor. (Doc. 14, p. 166). She indicated she had known J.T.P. for one year and saw him daily, five days a week, for math and reading. (Doc. 14, p. 166). She reported that Plaintiff had a serious problem in reading and/or comprehending written material; comprehending and doing math problems; learning new material; and recalling and applying previously learned material. (Doc. 14, p. 169). She reported that he had a very serious problem expressing ideas in written form, and that he required a lot of support in order to complete tasks. (Doc. 14, p. 169). Ms. Kyle found J.T.P. had a serious problem focusing long enough to finish assigned activity or tasks and refocusing to task when necessary; needed reminders and redirection at times; would not work independently for more than a couple of minutes at a time; and that he focused better in the morning with his medication than he did in the afternoon. (Doc. 14, p. 170). She noted that J.T.P. took medication on a regular basis, and was more focused since taking the medication. (Doc. 14, p. 174).

On December 4, 2012, Keith Norwood, M.S., and Tom Wright, Ed. D., performed an Intellectual Assessment of J.T.P. (Doc. 14, p. 298). They reported that J.T.P. was friendly and rapport was easily established; he related and communicated in an age appropriate manner; he did not have problems following directions; he attempted all presented tasks; and his speech was normal in rate and tone. (Doc. 14, p. 298). They further noted that J.T. P. was not easily distracted in the one-to-one situation where tasks were frequently changed, and his activity level was considered to be normal for his given age. (Doc. 14, p. 298). They reported

that J.T.P.'s social mannerisms were age appropriate and he communicated effectively, he was attentive, and made a consistent effort on all tasks. (Doc. 14, p. 300). Academically, he appeared to be functioning below expectations for his given ability level in all areas measured. They diagnosed J.T.P. with reading disorder, disorder of written expression, and mathematics disorder. (Doc. 14, p. 301).

On December 11, 2012, a Childhood Disability Evaluation Form was completed by Jerrye Woods, M.D. (Doc. 14, p. 303). Dr. Woods concluded that J.T.P.'s impairment or combination of impairments were severe, but did not meet, medically equal, or functionally equal the listings. (Doc. 14, p. 303). He found that J.T.P. had marked limitations in the domain of acquiring and using information, less than marked in two other domains, and had no limitation in three other domains. (Doc. 14, p. 305-306).

On February 26, 2013, J.T.P. and his mother saw Dr. Nwude for a medication follow-up. (Doc. 14, p. 324). Dr. Nwude reported that J.T.P. presented with inattention, but had no complaints of behavior problems or poor school performance since that semester. The school noted that he was having less behavioral problems, was doing better in his school performance, and had less disruptive behavior. (Doc. 14, p. 324). However, the school also reported that his medication seemed to be wearing off around 12 noon, and that he tended to become less attentive from then on. His mother noted that sometimes J.T.P. still had episodes of anger outbursts, but otherwise, he was doing better on his medication. (Doc. 14, p. 324). Dr. Nwude therefore increased his medication to 10 mg daily. (Doc. 14, p. 3260.

On April 19, 2013, Plaintiff presented to UAMS Family Medical Center for a well-child check, and it was reported that he was doing well, and that all milestones were met. (Doc. 14, p. 320). His ADHD was reported as unchanged. (Doc. 14, p. 323). J.T.P. saw Dr.

Nwude on May 3, 2013, for medication follow-up. (Doc. 14, p. 316). Dr. Nwude reported that he presented with behavioral problems, but at school there were no complaints of inattention, hyperactivity, or poor school performance. (Doc. 14, p. 316). He was still disobedient at home, fought with his siblings, and had anger outbursts. (Doc. 14, p. 316). Dr. Nwude increased the medication to 15 mg daily. (Doc. 14, p. 318). On July 22, 2013, when J.T.P. saw Dr. Nwude, he was reported as doing well on his medication, and Dr. Nwude reported no changes would be made at that time. (Doc. 14, p. 313).

At the hearing held on October 16, 2013, J.T.P.'s mother reported that he was making "pretty decent grades," and that as long as he had help, he did really well. (Doc. 14, p. 44). She further reported that when he came home from school, he would play outside, that he had friends at school, that he did his homework, and that with help, he read Dr. Seuss books, zombie books, and science books. (Doc. 14, p. 45). She reported that he got into a fight with a little boy at school, but other than that, he had not had any problems in school, only on the bus. (Doc. 14, p. 46). She also stated that normally, he had to clean his bedroom or generally pick up after himself and rinse his dishes. (Doc. 14, p. 47).

J.T.P. testified at the hearing, and stated that he liked school and had friends at school. (Doc 14, pp. 48-49).

### A. Whether the ALJ erred in finding J.T.P.'s ADHD did not Functionally or Medically Equal Listing 112.11:

Listing 112.11 provides as follows:

112.11 *Attention Deficit Hyperactivity Disorder*: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.
    The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

    A. Medically documented findings of all three of the following:

9

        1. Marked inattention; and
        2. Marked impulsiveness; and
        3. Marked hyperactivity;

    AND

    B. … for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

Listing 112.02B2 provides:

    2. For children (age 3 to attainment of age 18), resulting in at least two of the following:

    a. Marked impairment in age-appropriate cognitive /communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

    b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

    c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

    d. Marked difficulties in maintaining concentration, persistence, or pace.

In his decision, the ALJ stated that he considered the listed impairments related to mental problems – Listing 112.11 and 112.02 - and found that J.T.P.'s records were not indicative of the specific clinical signs and diagnostic findings pertaining to ADHD (Listing 112.11) or a learning disorder (112.02). (Doc. 14, p. 19). As noted by Defendant, although the ALJ did not explain his reasoning underlying his findings regarding the listings, his

failure to do so is not reversible error, so long as substantial evidence in the record supports his conclusion. See Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001); Briggs v. Callahan, 139 F.3d 606, 609 (8th Cir. 1998).

The ALJ determined that Plaintiff had marked limitations in acquiring and using information; less than marked limitations in attending and completing tasks; less than marked limitations in interacting and relating with others; no limitations in moving about and manipulating objects; no limitations in the ability to care for himself; and no limitations in health and physical well-being. (Doc. 14, pp. 24-29).

Plaintiff argues that J.T.P. exhibited extreme limitations in the domain of acquiring and using information. Alternatively, Plaintiff argues that he also has at a minimum, not only a marked limitation in acquiring and using information, but also a marked limitation in the ability to attend to and complete tasks. Plaintiff also alternatively argues that J.T.P.'s impairments were medically equal to listing 112.11, and that the ALJ "must have wholly disregarded or ignored J.T.P.'s ADHD Assessment performed by Dr. Van Kirk."

In fact, the ALJ did discuss Dr. Van Kirk's evaluation, reporting that she noted that the behavioral rating scales provided by J.T.P.'s mother, grandmother and teachers "indicated the claimant was significantly more inattentive and distractible than same-age boys; has more problems with learning, decision-making, judgment and organization than his peers; has more peer problems; and demonstrates more resistant or defiant behavior than would be expected for his age." (Doc. 14, p. 22). He further discussed the fact that after Dr. Van Kirk's evaluation, Dr. Nwude prescribed Focalin for J.T.P., pursuant to Dr. Van Kirk's recommendation. (Doc. 14, p. 22).

Once J.T.P. began taking the Focalin prescribed by Dr. Nwude, his symptoms improved. For example:

July 30, 2012 – Plaintiff reports to Dr. Nwude that J.T.P. seemed to be doing better since the medication started (Doc. 14, pp. 269, 271)

October 12, 2012 – teachers report J.T.P. doing much better since starting medication (Doc. 14, p. 335)

November 7, 2012 – teacher says J.T.P. more focused (Doc. 14, p. 174)

December 4, 2012 – Keith Norwood, J.S., and Tom Wright, Ed.D., say J.T.P. was not easily distracted, did not have problems following directions, attempted all tasks (Doc. 14, p. 298)

February 26, 2013 – J.P.T. presented to Dr. Nwude with inattention, but there were no complaints of behavior problems or poor school performance (Doc. 14, p. 324)

May 3, 2013 – after increased dosage of Focalin, J.T.P. presented to Dr. Nwude with behavioral problems, but there were no complaints at school of inattention, hyperactivity, or poor school performance. (Doc. 14, p. 316)

July 22, 2013, after increasing Focalin dosage, J.T.P. was reported as doing well, and no changes were made to his medication. (Doc. 14, p. 313)

Based upon the foregoing, the Court finds there is substantial evidence to support the ALJ's findings regarding the Listings. The longitudinal records indicate that Plaintiff's hyperactivity and compulsiveness resolved with medication. Accordingly, Plaintiff did not satisfy all three requirements of Listing 112.11. Although the Court need not further analyze Plaintiff's argument on this issue, the Court also finds that Plaintiff failed to meet the criteria under subpart B2 of Listing 112.02. The records reveal that J.T.P. had age-appropriate cognitive/communicative functioning, as evidenced by the December 4, 2012 findings of Keith Norwood and Tom Wright. (Doc. 14, p. 298). In addition, J.T.P.'s mother testified that J.T.P. was making good grades in his special education classes. (Doc. 14, p. 44).

There is also no question that J.T.P. does not have a marked impairment in age-appropriate social functioning. J.T.P. has friends at school that he plays with, and was found to communicate effectively. (Doc. 14, pp. 44, 49, 265, 298, 300, 316, 324).

### B. Whether J.T.P. Had Extreme Limitations in Acquiring and Using Information:

Plaintiff argues that J.T.P. has an extreme limitation in acquiring and using information. Plaintiff points to the findings of Dr. Van Kirk, Melanie Kyle, and the tests that were administered by Keith Norwood and Tom Wright.

As indicated earlier, a marked limitation in a domain is a limitation that "seriously interferes with a child's ability to 'independently initiate, sustain or complete activities.'" England, 490 F.3d at 1020. In assessing the domain of acquiring and using information, Melanie Kyle indicated that J.T.P. had a "very serious" problem in one area – expressing ideas in written form. She then found that J.T.P. had a "serious" problem in reading and/or comprehending written material; comprehending and doing math problems; learning new material; and recalling and applying previously learned material. (Doc. 14, p. 169).

State medical consultants Dr. Schnute and Dr. Woods reviewed the evidence, and Dr. Schnute found that J.T.P.'s impairment in this domain was less than marked, and Dr. Woods found it was marked. (Doc. 14, pp. 265, 305). Both found that while J.T.P.'s impairments or combination of impairments were severe, they did not meet, medically equal or functionally equal the listings. (Doc. 14, pp. 263, 303). Dr. Woods noted J.T.P.'s test scores in his assessment, noting a serious problem only with his writing. (Doc. 14, p. 305).

The Court finds that there is substantial evidence to support the ALJ's finding that J.T.P. has a marked, not extreme, limitation in acquiring and using information.

C. **Whether J.T.P. had Marked Limitations in Attending and Completing Tasks:**

Plaintiff argues that J.T.P. had marked limitations in attending and completing tasks, citing to Ms. Kyle's report, Dr. Van Kirk's observations, and Ms. Shreve's observations.

In this domain, Ms. Kyle found J.T.P. had a "serious" problems focusing long enough to finish an assigned activity and refocusing when necessary, and needed reminders and redirection at times. Dr. Shnute and Dr. Woods found Plaintiff had less than marked limitation in this domain. (Doc. 14, pp. 265, 305). It is noteworthy that after J.P.T. had been on medication for several months, Mr. Norwood and Mr. Wright reported that J.P.T. was not easily distracted in the one-to-one situation where tasks were frequently changed and that his grades had improved since taking medication. (Doc. 14, p. 298).

Based upon the foregoing and the entire record as a whole, the Court finds that there is substantial evidence to support the fact that J.P.T. had less than marked limitations in attending and completing tasks.

IV. **Conclusion:**

Accordingly, having carefully reviewed the record the Court finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits on behalf of J.P.T., and thus the decision is hereby affirmed. The Plaintiff's Complaint should be, and is hereby, dismissed with prejudice.

IT IS SO ORDERED this 8th day of November, 2016.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE